**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| CATHERINE PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 12-410 |
| | ) | Judge Nora Barry Fischer |
| PATRICK R. DONAHOE, | ) | |
| Postmaster General, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    Introduction

The instant action involves allegations that a female postal worker was sexually harassed by some of her male co-workers and later discharged in retaliation for complaining about that harassment.  Pending before the Court is a motion for summary judgment filed by the Defendant pursuant to Federal Rule of Civil Procedure 56.  (Docket No. 35).  For the reasons that follow, the Defendant's motion for summary judgment will be granted in part and denied in part.

### II.    Background

Plaintiff Catherine Phillips ("Phillips") is an adult Caucasian female residing in Butler County, Pennsylvania.  (Docket No. 13 at ¶ 3).  She was hired by the United States Postal Service as a mail handler, or casual employee, in 2006.  (Docket Nos. 40 & 41 at ¶ 1).  Casual employees of the Postal Service are non-union workers with no guaranteed work rights.  (*Id.*).  Phillips' workplace was located at the Pittsburgh Network Distribution Center ("NDC") in Warrendale, Pennsylvania.  (Docket No. 37 at ¶ 1).

On February 13, 2011, Phillips received a threatening text message from co-worker Jason Williams ("Jason").  (Docket Nos. 40 & 41 at ¶ 4).  The message implied that Phillips would

experience retaliation for statements that she had made about co-worker Maurice Williams ("Maurice"), who was Jason's cousin.[1]  (*Id.*).  Shortly thereafter, Maurice angrily confronted Phillips and asked her why she was "running her mouth" about him.[2]  (*Id.* at ¶ 5).  Phillips complained to Linda King ("King"), the Supervisor of Distribution Operations, who agreed that Jason's text message was threatening in nature.  (*Id.* at ¶ 4).  King spoke to both Phillips and Jason in an attempt to resolve the issue.  (*Id.*).

The matter was called to the attention of Jason's manager, Randall Daugherty ("Daugherty").  (Docket No. 38-2 at 3, ¶ 5).  Daugherty met with Jason on February 14, 2011.  (*Id.* at 3, ¶ 6).  During the meeting, Daugherty informed Jason that the text message sent to Phillips on the previous day had been deemed to be a "threat."  (Docket No. 38-4 at 3, ¶ 7).  In an attempt to demonstrate that he and Phillips were "on friendly terms," Jason showed Daugherty prior text messages that he had exchanged with Phillips.  (*Id.* at 3, ¶ 9).  Jason also displayed nude photographs of Phillips that he had received from Maurice.  (*Id.* at 3, ¶¶ 11-13).  Daugherty instructed Jason to delete the photographs from his telephone, to stop sending text messages to Phillips, and to avoid further contact with her.  (*Id.* at 3, ¶¶ 8, 15).  At some point during the next two weeks, Maurice's employment with the Postal Service was terminated because of an "unrelated incident."  (Docket No. 38-1 at 12; Docket No. 38-6 at 5).

On February 27, 2011, Phillips received a telephone call from co-worker Ronna Safka ("Safka"), who wanted to meet with her.  (Docket No. 38-1 at 8).  Phillips and Safka met during a subsequent break.  (*Id.*).  Safka revealed that Mark Mason ("Mason"), a co-worker, had stated that Jason's cellular telephone contained nude photographs of Phillips.  (*Id.*).  Phillips spoke with

---

[1] The message stated: "People are going back telling my cuzzo the shit u been saying about him so it's about to get ugly for u…just so u know."  (Docket No. 38-4 at 2, ¶ 5).
[2] In a declaration dated June 26, 2011, Maurice stated that two female co-workers had told him that Phillips was claiming to be involved in a "sexual relationship" with him.  (Docket No. 38-5 at 4, ¶ 19).

her supervisor, Christopher Dee ("Dee"), and said that she was thinking about quitting her job. (*Id.*). Dee discouraged Phillips from quitting and encouraged her to report the matter to King. (Docket Nos. 40 & 41 at ¶ 7). After hearing about the situation, King promised to look into the matter and get back to Phillips. (*Id.*). King called the matter to Daugherty's attention the next day. (Docket No. 38-2 at 4, ¶ 16).

Jason was on leave between February 28, 2011, and March 13, 2011. (Docket No. 38-2 at 4, ¶ 18). Daugherty interviewed several postal employees during Jason's absence. (*Id.* at 4, ¶ 19). Some of the employees interviewed by Daugherty confirmed that they had seen photographs of a nude female on Jason's telephone. (*Id.* at 4, ¶ 20).

Jason returned to work on March 14, 2011. (ECF No. 38-2 at 5, ¶ 23). During a pre-disciplinary interview with Daugherty, Jason acknowledged that he had shown nude photographs of Phillips to some of his co-workers. (Docket No. 38-4 at 4, ¶¶ 19-20). Jason received a fourteen-day suspension for his conduct. (*Id.* at 4, ¶ 24). That same day, Phillips initiated contact with an equal employment opportunity ("EEO") counselor.[3] (Docket No. 13 at 6, ¶ 29).

On June 7, 2011, Phillips filed a formal EEO complaint with the Postal Service.[4] (Docket No. 7-1 at 6-11). She alleged that the displaying of nude photographs of her to other postal employees had rendered her work environment hostile and abusive. (*Id.* at 8-9). Phillips also expressed concern that the pictures could be posted on Internet websites. (*Id.* at 9). She faulted the Postal Service for failing to notify her of the actions taken to protect her interests. (*Id.* at 8).

A regulation promulgated by the Equal Employment Opportunity Commission ("EEOC") permits a federal employee alleging the existence of workplace discrimination to "amend a

---

[3] A federal employee aggrieved by workplace discrimination must "try to informally resolve the matter" through a counselor before filing a formal complaint. 29 C.F.R. § 1614.105(a).
[4] "A complaint must be filed with the agency that allegedly discriminated against the complainant." 29 C.F.R. § 1614.106(a).

complaint at any time prior to the conclusion of the investigation to include issues or claims like or related to those raised in the complaint." 29 C.F.R. § 1614.106(d). Through a letter authored by her counsel, Phillips amended her complaint on June 14, 2011. (Docket No. 7-1 at 13-14). The amendment added allegations that managerial employees King and Joseph Buzzell ("Buzzell") had inappropriately disclosed confidential information about Phillips' complaint to non-managerial employees Patricia Murphy ("Murphy") and Rosemarie Stragand ("Stragand"). (*Id.* at 13). The alleged disclosures were described as acts of "continued sexual harassment" and "retaliation." (*Id.*).

Phillips became a postal support employee ("PSE") on July 16, 2011. (Docket Nos. 40 & 41 at ¶ 2). She worked as a mail processing clerk. (*Id.*). Phillips' appointment to the position was contingent upon her successful completion of a ninety-day probationary period. (Docket No. 38-17 at 4, ¶ 12).

On July 25, 2011, Buzzell encountered Phillips while walking to his office. (Docket No. 38-11 at 9). He asked why his name had been mentioned in her EEO complaint. (*Id.*). Phillips responded by stating that her attorney had instructed her not to discuss the matter. (*Id.*). The verbal exchange apparently left Phillips so upset that she decided to leave her work station. (Docket Nos. 40 & 41 at ¶ 19). Manager James Faloon ("Faloon") told Phillips that she needed to complete a leave slip. (Docket No. 38-1 at 15). After completing the leave slip, Phillips left work five hours early. (Docket No. 38-15 at 2). She listed "stress" as the reason for her departure. (*Id.*).

Phillips amended her EEO complaint again on August 3, 2011. (Docket No. 7-1 at 16-17). In the portion of his letter explaining the grounds for the amendment, Phillips' counsel stated as follows:

> Specifically, on July 25, 2011 a manager, Joe Buzell [sic], screamed at Ms. Phillips while pointing his finger at her upon receipt of correspondence from the EEO investigator. He yelled at Ms. Phillips for filing an EEO complaint. She became upset and asked to leave early. Other employees had seen this conduct. She was asked to sign a leave slip to leave early which she never had to do before if she had to leave early. Ms. Phillips lost some wages as a result. Since that occasion, Joe Buzell [sic] and Chris Dee, another manager, have been assigning her to jobs with less favorable conditions, i.e. more work and less help. Also they are constantly changing her work schedule (days off) without sufficient notice and for no legitimate purpose.

(*Id.* at 16). The conduct described in the amendment letter was characterized as a form of "additional retaliation." (*Id.*).

During the summer of 2011, Mary Delaney ("Delaney") served as the Supervisor of Distribution Operations for the Postal Service's Warrendale facility. (Docket No. 38-17 at 2, ¶ 3). On August 16, 2011, Delaney performed a "thirty-day employee evaluation" of Phillips. (*Id.* at 4, ¶ 17). On the evaluation form, Delaney rated Phillips' "attendance" as "unacceptable." (Docket No. 38-19 at 2). Phillips' performance was deemed to be "satisfactory" in all other categories. (Docket No. 38-19 at 2-3).

Phillips was scheduled to work from 2:00 P.M. through 9:00 P.M. on August 26, 2011. (Docket No. 38-17 at 5, ¶ 25). Due to an illness, she left a voicemail message that morning declaring her intention to remain at home. (Docket No. 38-1 at 24). The message was apparently left with the "tour office" at 8:11 A.M. (Docket No. 37 at ¶ 171; Docket No. 38-17 at 5, ¶ 29). When Phillips returned to work on August 27, 2011, she was told to discuss her absence with Kathleen Wells ("Wells"), who served as the Manager of Distribution Operations. (Docket No. 38-1 at 24). During a meeting with Phillips and Delaney, Wells chastised Phillips for calling the tour office's telephone number rather than the number that she had previously been instructed to use when calling off. (Docket No. 38-18 at 5, ¶¶ 30-33).

A second meeting between Phillips, Delaney and Wells was conducted on September 2, 2011. (Docket No. 38-1 at 25). Wells asked Phillips to provide documentation for her earlier absences. (Docket No. 37 at ¶ 183). Phillips was not able to provide the requested documents. (Docket No. 38-1 at 25). Wells concluded the meeting by informing Phillips that she was being discharged. (Docket No. 37 at ¶ 190). In a memorandum dated September 3, 2011, Wells stated that Phillips had been terminated for declining to provide the appropriate documentation for her absences and failing to follow the proper call-off procedures. (Docket No. 38-22 at 2). The memorandum was co-signed by Buzzell, who was listed as the "concurring official." (*Id.*). In a letter to Phillips dated September 9, 2011, Plant Manager Lauren Harkins ("Harkins") made the following observations:

> You were provided with instructions regarding how to properly report off work due to emergency, illness, or injury at your orientation. You failed to comply with the instructions provided. At your 30 day review, on August 16, 2011, you were informed that your attendance was unsatisfactory. You continued to have unscheduled absences after your 30 day review. On September 2, 2011, when you were questioned regarding your continued unscheduled absences and your failure to follow call-off procedures, documentation was requested for your absences; your explanations were not credible and you informed management that you could not provide documentation.

(Docket No. 39-1 at 4). Harkins' letter went on to state that since Phillips had not completed ninety days of work or been employed as a PSE for 120 calendar days, she did not have any "appeal rights" under the applicable "grievance-arbitration procedure." (*Id.* at 5). On September 16, 2011, Phillips amended her EEO complaint to allege that she had been discharged in retaliation for her earlier complaints. (Docket No. 7-1 at 39-41).

After her termination, Phillips applied for unemployment compensation benefits. (Docket No. 39-1 at 7). Under Pennsylvania law, an individual is "ineligible for compensation for any week . . . [i]n which h[er] unemployment is due to h[er] discharge or temporary

suspension from work for willful misconduct connected with h[er] work." 43 PA. STAT. § 802(e). Phillips' claim was initially denied on that ground. (Docket No. 39-1 at 7). She filed an appeal on October 4, 2011. (*Id.*). On November 2, 2011, a hearing was held before Referee Carolyn Corry ("Referee"). (*Id.*). After listening to testimonial evidence, the Referee reversed the earlier decision denying Phillips' application for benefits.[5] (*Id.* at 7-9). In her decision, the Referee declared that the conduct for which Phillips had been discharged did not constitute "willful misconduct" under Pennsylvania law. (*Id.* at 9).

Phillips commenced this action against Postmaster General Patrick R. Donahoe[6] on March 30, 2012, alleging that she had been discharged in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*] and the Pennsylvania Human Relations Act ("PHRA") [43 PA. STAT. § 951 *et seq.*]. (Docket No. 1). She averred that she had been subjected to sexual harassment, discrimination based on her race and sex, and retaliation for her EEO complaints. (*Id.* at ¶ 1). On August 23, 2012, the Postmaster General moved for the dismissal of Phillips' race-based discrimination and PHRA claims. (Docket No. 6). He maintained that Phillips had not properly exhausted her race-based discrimination claims. (Docket No. 7 at 5-7). The Postmaster General also argued that the Postal Service was not subject to the PHRA's requirements. (*Id.* at 4-5). The parties stipulated to the dismissal of the challenged claims on September 6, 2012, thereby mooting the motion to dismiss. (Docket Nos. 10-12). Phillips filed an amended complaint one week later, asserting sex-based discrimination and retaliation claims under Title VII. (Docket No. 13). The Postmaster General filed a motion

---

[5] The Referee had the authority to "affirm, modify, or reverse" the factual findings challenged by Phillips. 43 PA. STAT. § 822.
[6] An employment discrimination claim brought by a federal employee must be asserted against "the head of the [relevant] department, agency, or unit." 42 U.S.C. § 2000e-16(c).

for summary judgment on July 8, 2013. (Docket No. 35). That motion is the subject of this memorandum opinion.

### III. <u>Standard of Review</u>

Summary judgment may only be granted where the moving party shows that there is no genuine dispute as to any material fact, and that a judgment as a matter of law is warranted. FED. R. CIV. P. 56(a). Pursuant to Federal Rule of Civil Procedure 56, the Court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor. *Watson v. Abington Township*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof. *Celotex Corp.*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Id.* at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported

factual allegations contained in his or her pleadings.  *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

## IV.    Jurisdiction and Venue

The Court has subject-matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).  Venue is proper under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

## V.    Discussion

The amended complaint contains a single Title VII count alleging that Phillips was the victim of sex-based discrimination and retaliation.[7]  (Docket No. 13 at ¶¶ 39-41).  The precise theories underpinning Phillips' claims are not clearly articulated.  Based on the factual averments contained in the amended complaint and the arguments advanced in the briefs filed by the parties, the Court understands Phillips to assert "hostile work environment" and retaliation claims under Title VII.  (Docket No. 13 at ¶¶ 1-38; Docket No. 36 at 3-22; Docket No. 39 at 14-22).

### A.    The Hostile Work Environment Claim

The anti-discrimination provision of Title VII applicable to private-sector[8] employers, which is codified at 42 U.S.C. § 2000e-2(a)(1), declares it to be an "unlawful employment practice" for a covered employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his [or her] compensation, terms,

---

[7] The amended complaint incorrectly references the Age Discrimination in Employment Act of 1967 ("ADEA") [29 U.S.C. § 621 *et seq.*].  (Docket No. 13 at ¶¶ 1, 40).  In a stipulation executed on October 11, 2012, the parties explained that the amended complaint includes only a Title VII claim "involving a matter of sexual discrimination." (Docket No. 21 at 2).

[8] Employees of state and local governments enjoy protection under Title VII's "private-sector" provisions.  42 U.S.C. § 2000e(a), (b), (f); *Fitzpatrick v. Bitzer*, 427 U.S. 445, 448-449, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976).  While the reach of those provisions extends beyond the "private sector," the Court refers to them as the "private-sector" provisions in order to distinguish them from the federal-sector provision at issue in this case.  *Gomez-Perez v. Potter*, 553 U.S. 474, 487-488, 128 S.Ct. 1931, 170 L.Ed.2d 887 (2008).

conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[9] 42 U.S.C. § 2000e-2(a)(1). In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 63-69, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the United States Supreme Court explained that an employer unlawfully "discriminates" against an employee "because of" his or her "sex" when it perpetrates sex-based harassment that is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment.[10] Claims asserted pursuant to the rule announced in *Meritor Savings Bank* are commonly referred to as "hostile work environment" claims. *Bouton v. BMW of North America, Inc.*, 29 F.3d 103, 106 (3d Cir. 1994).

The United States is specifically excluded from Title VII's definition of the term "employer."[11] 42 U.S.C. § 2000e(b). Therefore, § 2000e-2(a)(1) does not apply to the Postal Service. Phillips' claims arise under Title VII's federal-sector provision, which is codified at 42 U.S.C. § 2000e-16(a). The federal-sector provision provides that "[a]ll personnel decisions affecting employees or applicants for employment . . . in the United States Postal Service . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."[12] 42 U.S.C. § 2000e-16(a). The Postmaster General does not question Phillips' assumption that "hostile work environment" claims are cognizable under the federal-sector provision. (Docket No. 36). For present purposes, the Court will assume *arguendo* that such claims are cognizable. *Ullrich v. U.S. Secretary of Veterans Affairs*, 457 Fed.Appx. 132, 140, n. 6 (3d Cir. 2012)(unpublished). The Court will further assume that Phillips' "hostile work

---

[9] A separate provision of Title VII declares it to be an "unlawful employment practice" for a covered employer "to limit, segregate, or classify his [or her] employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his [or her] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2).

[10] The same rule applies to harassment based on other traits protected under Title VII. *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 116, n. 10, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

[11] The definition similarly excludes "a[ny] corporation wholly owned by the Government of the United States." 42 U.S.C. § 2000e(b).

[12] This provision was added to Title VII by the Equal Employment Opportunity Act of 1972. Pub. L. No. 92-261, § 11, 86 Stat. 103, 111 (1972).

environment" claim is governed by the standard articulated in *Meritor Savings Bank*, and that she can establish an actionable violation of § 2000e-16(a) without demonstrating that the relevant harassment constituted (or affected) a "personnel decision." *Swingle v. Henderson*, 142 F.Supp.2d 625, 633-634 (D.N.J. 2001).

In order to establish a violation of Title VII, Phillips must demonstrate that she was subjected to intentional "discrimination" because of her sex. *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997). The harassment underpinning the "hostile work environment" claim in this case centered on Jason's display of photographic depictions of Phillips' nude body. (Docket No. 13 at ¶ 11). Phillips testified that she had never seen the pictures. (Docket No. 38-1 at 10). Jason, Maurice and Daugherty have submitted statements declaring that the images depicted Phillips "in a number of sexually suggestive poses." (Docket No. 38-2 at 3, ¶ 13; Docket No. 38-4 at 3, ¶ 14; Docket No. 38-5 at 3, ¶ 6). Given the sexual nature of the photographs, it is "reasonable to assume" that they would not have been in Jason's possession (or displayed to others) had they been depictions of a male co-worker.[13] *Oncale v. Sundower Offshore Services, Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Based on the undisputed evidence contained in the record, a reasonable trier of fact could conclude that Phillips was subjected to sex-based "discrimination." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 332 (4th Cir. 2011)("A juror could reasonably find that sexualizing the work environment by placing photos of nude women or women in sexually provocative dress and

---

[13] Depictions of nude bodies are not inherently sexual in nature. *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 579, n. 9, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002)(explaining that "pictures of a war victim's wounded nude body" could not reasonably be described as "erotic"). Under the present circumstances, however, there is no basis for inferring that Jason would have possessed nude photographs of a male in Phillips' situation. Since the pictures of Phillips apparently existed for no purpose other than to expose her nude body, she would probably be able to satisfy Title VII's "discrimination" prong even in the absence of evidence demonstrating that the depictions were "sexually suggestive." *Toth v. California University of Pennsylvania*, 844 F.Supp.2d 611, 629 (W.D.Pa. 2012)(remarking that "a heterosexual individual will ordinarily be sexually disinterested in *all* members of the same sex")(emphasis in original).

poses in common areas is detrimental to female employees and satisfies the 'because of sex' requirement.").

"Harassment which does not alter the 'terms, conditions, or privileges' of one's employment, however reprehensible it may be, does not run afoul of Title VII." *Howard v. Blalock Electric Service, Inc.*, 742 F.Supp.2d 681, 689 (W.D.Pa. 2010). In order for "an atmosphere of sexual harassment or hostility to be actionable" under Title VII, "the offending behavior 'must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Pennsylvania State Police v. Suders*, 542 U.S. 129, 146-147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004), quoting *Meritor Savings Bank*, 477 U.S. at 67. "This standard incorporates both objective and subjective elements." *Mitchell v. Miller*, 884 F.Supp.2d 334, 376 (W.D.Pa. 2012). In *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court explained:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris*, 510 U.S. at 21-22. The inquiry is context-specific and "accounts for all relevant factors." *Howard*, 742 F.Supp.2d at 690. "Such factors include, but are not limited to, whether the alleged discriminatory harassment is frequent, whether it is severe, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance." *Hubbell v. World Kitchen, LLC*, 688 F.Supp.2d 401, 419 (W.D.Pa. 2010), citing *Harris*, 510 U.S. at 23.

An employee must have some awareness of harassing behavior in order to perceive it as hostile or abusive. *Cottrill v. MFA, Inc.*, 443 F.3d 629, 636-638 (8th Cir. 2006)(holding that a female employee who had been surreptitiously viewed by a male supervisor while using the women's restroom could not rely on such "peeping" to establish the existence of a "hostile work environment" because she had not known about it during the relevant period of time). Phillips first learned that Jason possessed nude photographs of her on February 27, 2011.[14] (Docket No. 38-1 at 9). The discovery apparently left her so upset that she wanted to quit her job. (*Id.* at 8). The next day, co-worker Dan Blackman ("Blackman") asked Phillips whether she had any more "nice pictures."[15] (*Id.* at 12). Phillips testified that no incidents related to the photographs had occurred subsequent to her encounter with Blackman. (*Id.* at 12-13). Jason, who was on leave for the next two weeks, did not return to work until March 14, 2011. (Docket No. 38-4 at 4, ¶ 18). He evidently deleted the photographs of Phillips immediately after his meeting with Daugherty. (*Id.* at 4, ¶ 23). Jason's actions resulted in a fourteen-day suspension. (*Id.* at 4, ¶ 24).

Harassing behavior must be "severe *or* pervasive" to implicate Title VII. *Jensen v. Potter*, 435 F.3d 444, 449, n. 3 (3d Cir. 2006)(emphasis in original). An "extremely serious" incident can amount to a change in the "terms, conditions, or privileges" of one's employment even in the absence of ongoing misconduct. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). When a single act of discrimination "irrevocably alters the conditions of the victim's work environment," it satisfies the test announced in *Meritor*

---

[14] The amended complaint alleges that Phillips became aware of the photographs on February 19, 2011. (Docket No. 13 at ¶ 7). During her deposition, however, Phillips testified that her conversation with Safka had occurred on February 27, 2011. (Docket No. 38-1 at 9).

[15] The verbal exchange between Blackman and Phillips was described during Phillips' deposition. (Docket No. 38-1 at 8-9, 12-13). When confronted by King, Blackman denied that he had asked Phillips whether she had any more "nice pictures." (Docket No. 38-6 at 8). Because the Postmaster General is the party moving for summary judgment, Phillips' testimony is assumed to be true. *Thompson v. Wagner*, 631 F.Supp.2d 664, 681 (W.D.Pa. 2008).

*Savings Bank. Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2001). The mere fact that Jason's harassing conduct spanned a brief period of time does not warrant the dismissal of Phillips' "hostile work environment" claim. *Howard*, 742 F.Supp.2d at 692 (explaining that "the more 'severe' harassing acts are, the less 'pervasive' they have to be to constitute an actionable violation of Title VII").

Given that Phillips almost quit her job after learning that depictions of her nude body had been shown to her co-workers, a reasonable trier of fact could conclude that she subjectively perceived her work environment to be abusive.[16] *Harris*, 510 U.S. at 21-22. A review of basic legal principles confirms that Jason's conduct could also be regarded as "objectively offensive." *Oncale*, 523 U.S. at 81. A search involving the exposure of an individual's intimate body parts is more likely to be "unreasonable" within the meaning of the Fourth Amendment than a search of the individual's outer clothing. *Safford Unified School District #1 v. Redding*, 557 U.S. 364, 373-377, 129 S.Ct. 2633, 174 L.Ed.2d 354 (2009). Title VII sometimes permits an employer to consider a person's sex in determining whether he or she can effectively perform medical or personal-care tasks involving the exposure of a patient's intimate body parts.[17] *Healey v. Southwood Psychiatric Hospital*, 78 F.3d 128, 133-134 (3d Cir. 1996). Under Pennsylvania law, it is a criminal offense to "[v]iew" or "photograph" a person "without that person's knowledge or consent while that person is in a state of full or partial nudity and is in a place where that person would have a reasonable expectation of privacy." 18 PA. CONS. STAT. § 7507.1(a)(1).

---

[16] The fact that Phillips continued to work for the Postal Service in the aftermath of the incident is of no dispositive significance. An employee's work environment can violate Title VII without precipitating his or her constructive discharge. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004)(remarking that "[a] hostile-environment constructive discharge claim entails something more" than an ordinary Title VII claim premised on harassment).

[17] Title VII's private-sector provisions permit a covered business or enterprise to make personnel decisions on the basis of religion, sex, or national origin "in those certain instances where religion, sex, or national origin is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise." 42 U.S.C. § 2000e-2(e)(1).

Pennsylvania law also prohibits an individual from "expos[ing] his or her genitals in any public place or in any place where there are present other persons under circumstances in which he or she knows or should know that this conduct is likely to offend, affront or alarm." 18 PA. CONS. STAT. § 3127(a). Since the law reflects a societal interest in preventing the unauthorized exposure of an individual's intimate body parts, a trier of fact could plausibly conclude that an objectively reasonable person in Phillips' situation would find his or her work environment to be "hostile or abusive." *Harris*, 510 U.S. at 22 (explaining that one's work environment may "reasonably be perceived" to be "hostile or abusive" even if it is not "psychologically injurious").

The remaining question is whether the Postal Service may be held liable for Phillips' work environment under the present circumstances. An employer is *vicariously* liable for an actionable "hostile work environment" "created by a supervisor with immediate (or successively higher) authority over the [victimized] employee." *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher*, 524 U.S. at 807. Where the supervisor's harassment does not culminate in a tangible employment action, the employee's Title VII claim is "subject to an affirmative defense permitting the employer to avoid liability upon establishing, by a preponderance of the evidence, that it 'exercised reasonable care to prevent and correct promptly' any harassing behavior, and that the employee 'unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer.'" *Howard*, 742 F.Supp.2d at 695, quoting *Burlington Industries*, 524 U.S. at 765, and *Faragher*, 524 U.S. at 807. The affirmative defense is unavailable when the supervisor's misconduct culminates in a tangible employment action that is adverse to the employee. *Suders*, 542 U.S. at 137 (explaining that "an employer is strictly liable for supervisor harassment"

culminating in the employee's discharge, demotion, or undesirable reassignment).  Where a

"hostile work environment" results from harassment perpetrated by an employee's *co-workers*,

"there is no presumption of employer liability or accompanying burden on the employer to

establish an affirmative defense to liability."  *Andreoli v. Gates*, 482 F.3d 641, 648 (3d Cir.

2007).  In that scenario, the plaintiff "must demonstrate that the employer failed to provide a

reasonable avenue for complaint," or that the employer was aware of the harassment and

nevertheless declined to "take appropriate remedial action."  *Weston v. Pennsylvania*, 251 F.3d

420, 427 (3d Cir. 2001).  If an employer neglects to stop discriminatory harassment perpetrated

by a non-supervisory employee, it can be held *directly* liable for its own negligence[18] even

though it would not be vicariously liable for the harassment under a theory of *respondeat

superior*.  *Kunin v. Sears Roebuck & Co.*, 175 F.3d 289, 293, n. 5 (3d Cir. 1999).

　　In *Vance v. Ball State University*, 570 U.S. ___, ___, 133 S.Ct. 2434, 2439, 186 L.Ed.2d

565 (2013), the Supreme Court held that an individual may be regarded as "a 'supervisor' for

purposes of vicarious liability under Title VII if he or she is empowered by the employer to take

tangible employment actions" against the plaintiff.  The harassment underpinning Phillips' claim

was allegedly perpetrated by Jason and Maurice.  The record conclusively establishes that neither

Jason nor Maurice qualified as a "supervisor" under *Vance*.  (Docket No. 38-1 at 6; Docket No.

38-4 at 2, ¶ 4; Docket No. 38-5 at 2, ¶ 4).  Consequently, Phillips cannot prevail without

establishing that the Postal Service was negligent.  *Vance*, 133 S.Ct. at 2451-2453.

　　An employer's duty to take remedial action against workplace harassment is obviously

triggered if the employer has *actual notice* that unlawful harassment is occurring.  *Priller v.*

---

[18] "Negligence" is generally defined as "the failure to observe, for the protection of another's interest, such care and precaution as the circumstances demand, or the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances."  *Witt v. Norfe, Inc.*, 725 F.2d 1277, 1278 (11th Cir. 1984); *Seaboard Coast Rairoad Co. v. Griffis*, 381 So.2d 1063, 1065 (Fla.Dist.Ct.App. 1979).

*Town of Smyrna*, 430 F.Supp.2d 371, 379-380 (D.Del. 2006). An employer is charged with *constructive notice* of harassing behavior if the victimized employee provides "management level personnel" with enough information to raise a probability of harassment in the mind of an objectively reasonable employer, or if the harassment is "so pervasive and open" that it is logical to presume that an objectively reasonable employer would have known about it. *Kunin*, 175 F.3d at 294; *Howard*, 742 F.Supp.2d at 696. Discussing the issue of constructive notice in *Huston v. Proctor & Gamble Paper Products Corp.*, 568 F.3d 100, 107-108 (3d Cir. 2009), the United States Court of Appeals for the Third Circuit held that an employee's knowledge of ongoing harassment could be imputed to the employer only where the employee is "sufficiently senior in the employer's governing hierarchy" that such knowledge is important to the performance of his or her *general* management duties, or where the employee is *specifically* employed to deal with issues pertaining to harassment. In their briefs, the parties do not discuss whether this standard has been satisfied. (Docket No. 36 at 3-6; Docket No. 39 at 14-20). Since the issue is not dispositive in this case, the Court will assume *arguendo* that the Postal Service was on constructive notice of any harassing behavior known to King or Daugherty. *Huston*, 568 F.3d at 107-108.

It is undisputed that Maurice provided Jason with nude photographs of Phillips. (Docket No. 38-2 at 3, ¶ 12; Docket No. 38-4 at 3, ¶ 13). The manner in which Maurice obtained those photographs, however, is hotly contested by the parties. In a declaration signed on June 26, 2011, Maurice stated that Phillips had forwarded nude photographs of herself to his cellular telephone during the fall of 2010. (Docket No. 38-5 at 3, ¶ 5). During a deposition conducted on December 19, 2012, Phillips denied that she had created photographic images of her naked body. (Docket No. 38-1 at 11). She testified that the very existence of the photographs had been

unknown to her before February 27, 2011. (*Id.* at 9). Phillips asserted that, on one occasion in October 2010, she and Maurice had entered a motel room in an intoxicated state. (*Id.* at 10). She stated that she had fallen unconscious shortly after lying on a bed inside of the room. (*Id.*). Phillips testified that she had later awoken "with no clothes on." (*Id.*). Although she had no firsthand knowledge of what had actually happened, Phillips speculated that Maurice may have removed her clothes and taken pictures of her nude body during her period of unconsciousness. (*Id.*). She further suggested that he may have "put something in [her] drink" before removing her clothes. (*Id.* at 9-10). In his declaration, Maurice unequivocally denied that he had ever incapacitated Phillips or taken pictures of her naked body. (Docket No. 38-5 at 3, ¶¶ 7-11). Nonetheless, Maurice stated that he had engaged in "consensual sexual relations" with Phillips on one occasion. (*Id.* at 3, ¶ 17). Phillips testified that she had never engaged in sexual relations with Maurice.[19] (Docket No. 38-1 at 7).

Since the Postmaster General is the party moving for summary judgment, the testimony given by Phillips must be credited at this stage. *Thompson v. Wagner*, 631 F.Supp.2d 664, 681 (W.D.Pa. 2008). For purposes of the instant motion, the Court will assume that Phillips did not provide Maurice with depictions of her nude body, and that the images were created without her knowledge or consent. (Docket No. 38-1 at 9-11). The manner in which the photographs were actually created, however, is not what matters. The dispositive inquiry centers on the information that was available to King and Daugherty during the relevant period of time. *Huston*, 568 F.3d at 104-110.

Daugherty met with Jason on February 14, 2011, to discuss the text message that he had sent to Phillips one day earlier. (Docket No. 38-2 at 3, ¶¶ 5-7). In an attempt to demonstrate that

---

[19] Although Phillips expressed the view that Maurice had undressed her in the motel room, she denied fearing that he had raped her on that occasion. (Docket No. 38-1 at 10). She testified that the incident had left her too "upset," "ashamed" and "disgusted" to contact law enforcement authorities. (*Id.*).

he and Phillips were "on friendly terms," Jason showed Daugherty text messages that he had previously exchanged with Phillips. (Docket No. 38-4 at 3, ¶ 10). Jason also allowed Daugherty to view nude images of Phillips that had been provided by Maurice. (*Id.* at 3, ¶¶ 11-13). According to both Jason and Daugherty, the pictures depicted Phillips "in a number of sexually suggestive poses where she appeared to be awake, alert and conscious." (Docket No. 38-2 at 3, ¶ 13; Docket No. 38-4 at 3, ¶ 14). In one of the pictures, Phillips was allegedly shown "sitting on the edge of a bed with her fingers in her mouth."[20] (Docket No. 38-2 at 3-4, ¶ 13; Docket No. 38-4 at 3, ¶ 14). Daugherty instructed Jason to delete the photographs from his telephone, to stop exchanging text messages with Phillips, and to avoid contact with her. (Docket No. 38-2 at 3-4, ¶¶ 8, 14). Jason expressed an intention to comply with Daugherty's instructions. (Docket No. 38-4 at 3, ¶ 16).

Jason evidently failed to delete the nude images of Phillips in the immediate aftermath of his conversation with Daugherty. The photographs were viewed by some of Jason's co-workers on February 27, 2011. (Docket No. 38-4 at 4, ¶ 17). Safka called the matter to Phillips' attention shortly after hearing Mason discuss the content of the photographs. (Docket No. 38-1 at 8). Phillips complained to King, who acknowledged that Daugherty had seen the images two weeks earlier. (Docket No. 38-1 at 8). In a message emailed to Daugherty later that evening, King stated that Jason's actions were "creating a hostile work environment." (Docket No. 38-3 at 21).

Daugherty started to investigate the situation on February 28, 2011. (Docket No. 38-2 at 4, ¶ 17). Although some of the postal workers interviewed by Daugherty acknowledged that they had seen pictures of a nude woman on Jason's telephone, only one of those individuals

---

[20] Jason stated that a separate photograph had shown Phillips "completely naked and sitting on gym equipment." (Docket No. 38-4 at 3, ¶ 14). Since the alleged depiction of Phillips "sitting on gym equipment" was not mentioned in Daugherty's declaration, it is not clear whether it was shown to him during his meeting with Jason.

knew the woman's identity.[21]  (*Id.* at 4, ¶ 21).  Daugherty instructed this individual to "keep his mouth shut" about the matter.  (*Id.* at 4, ¶ 22).  The other postal workers were told to forget that they had ever seen the photographs.  (*Id.*).

On March 14, 2011, Jason returned to work after a two-week leave of absence.  (Docket No. 38-4 at 4, ¶ 18).  During a pre-disciplinary interview with Daugherty, Jason admitted that he had permitted some of his co-workers to view the nude photographs of Phillips stored on his telephone.  (*Id.* at 4, ¶ 20).  Daugherty again instructed Jason to delete the images.  (*Id.* at 4, ¶ 22).  Jason received a fourteen-day suspension for his conduct.  (*Id.* at 4, ¶ 24).  King notified Phillips of Jason's suspension a few days later.  (Docket No. 38-1 at 12).

During her conversation with King on February 27, 2011, Phillips expressed the view that Jason's conduct was related to the "threatening" text message that he had previously sent.  (Docket No. 38-3 at 21).  In a declaration submitted in support of the Postmaster General's motion for summary judgment, Jason stated that he had "inadvertently" showed the nude images of Phillips to his co-workers while scrolling through pictures of his girlfriend.[22]  (Docket No. 38-4 at 4, ¶ 17).  Regardless of Jason's reasons for displaying the pictures to his co-workers, it is undisputed that his fourteen-week suspension ended the harassment suffered by Phillips.  Jason declared that he had deleted the photographs from his telephone immediately after his March 14, 2011, meeting with Daugherty.  (*Id.* at 4, ¶ 23).  Phillips testified that no incidents relating to the images had occurred subsequent to Jason's suspension.  (Docket No. 38-1 at 13).

On the basis of the existing record, the Postmaster General is entitled to summary judgment pursuant to the standard announced in *Knabe v. Boury Corp.*, 114 F.3d 407 (3d Cir. 1997).  In *Knabe*, the United States Court of Appeals for the Third Circuit declared that an

---

[21] It is not clear whether this individual was Mason, Blackman, or a different postal worker.
[22] The documentary record suggests that Jason's explanation for his conduct was conveyed to Daugherty on March 14, 2011.  (Docket No. 38-3 at 27).

employee seeking to hold an employer liable under Title VII for a "hostile work environment" created by a non-supervisory co-worker must demonstrate that the employer failed to take remedial action that was "reasonably calculated to prevent further harassment" of the victimized employee after learning of the co-worker's misconduct. *Knabe*, 114 F.3d at 412. Under this standard, any remedial action that effectively stops the offending employee from harassing the victim is considered to be "adequate as a matter of law." *Knabe*, 114 F.2d at 411, n. 8. Since Phillips was not subjected to further harassment after Jason's suspension, she cannot establish that the Postal Service was negligent in addressing her situation. *Huston*, 568 F.3d at 110.

Phillips suggests that the Postal Service was negligent in failing to secure the images of her nude body during the two weeks between Jason's "threatening" text message and her discovery that the pictures were on his telephone. (Docket No. 39 at 15-16). Daugherty saw the photographs on February 14, 2011. (Docket No. 38-2 at 3, ¶ 11). He apparently informed King of their existence after his meeting with Jason. (Docket No. 38-1 at 8). Phillips testified that she had not known about the pictures prior to February 27, 2011. (*Id.* at 9). She evidently believes that the Postal Service's failure to deal with the situation more effectively during the intervening period of time can support a finding of liability under Title VII. (Docket No. 39 at 15-16).

Daugherty instructed Jason to delete the nude photographs of Phillips from his telephone on February 14, 2011. (Docket No. 38-2 at 4, ¶ 14). Jason immediately stated that he would comply with Daugherty's instruction. (Docket No. 38-4 at 3, ¶ 16). Although Jason failed to honor his promise, Daugherty's order was "reasonably calculated to prevent future harassment." *Knabe*, 114 F.3d at 411, n. 8. The fact that Jason neglected to follow that order does not mean that Daugherty's conduct was negligent at the time that the order was given. *Id.* at 415 (explaining that the question of "whether a chosen remedy was reasonably calculated to prevent

further acts of harassment" must be considered in relation to the time that the remedy is "put into place").

During her deposition, Phillips was unable to confirm that the photographs of her nude body had been taken in the motel room that she had entered with Maurice in October 2010. (Docket No. 38-1 at 10). She testified that she only remembered entering the room with clothes on, losing consciousness, and waking up nude. (*Id.*). Maurice declared that Phillips had voluntarily sent nude photographs of herself to his cellular telephone during the fall of 2010. (Docket No. 38-5 at 3, ¶ 5). He denied involvement in the creation of those images. (*Id.* at 3, ¶ 7). Phillips testified that she had never created or forwarded pictures of her naked body. (Docket No. 38-1 at 11). Regardless of how the photographs were originally produced, it is undisputed that Jason ultimately received them from Maurice. (Docket No. 38-4 at 3, ¶ 13; Docket No. 38-5 at 3, ¶ 5). The fact that the photographs on Jason's telephone had been provided by Maurice was conveyed to Daugherty on February 14, 2011. (Docket No. 38-2 at 3, ¶ 12).

If Phillips was disrobed and photographed without her knowledge or consent, she was the victim of a crime. 18 Pa. Cons. Stat. § 7507.1(a)(1)-(3). When an individual is unwillingly photographed in a sexually-oriented manner, the "continued circulation" of the resulting depictions can inflict further harm on his or her "reputation and emotional well-being." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). A "hostile work environment" created by criminal voyeurism would warrant a more aggressive response than an abusive atmosphere attributable to less serious forms of harassment. *Knabe*, 114 F.3d at 414, n. 13 (observing that "a warning would not be an adequate remedy in a situation in which an employee alleged that she was raped by another employee"). For this reason, an

employer's failure to adequately address an instance of known voyeurism could result in a finding of liability under Title VII. *Vance*, 133 S.Ct. at 2452 (explaining that "an employer will always be liable when its negligence leads to the creation or continuation of a hostile work environment").

The reasonableness of Daugherty's conduct, however, must be considered in relation to the information that was available to him. *Huston*, 568 F.3d at 109-110; *Knabe*, 114 F.3d at 415. During his meeting with Daugherty on February 14, 2011, Jason displayed nude images of Phillips in order to demonstrate that the two of them were "on friendly terms." (Docket No. 38-4 at 3, ¶ 9). He told Daugherty that the pictures had been provided by Maurice. (Docket No. 38-2 at 3, ¶ 12). Nothing in the record suggests that Daugherty knew (or should have known) that the photographs had (allegedly) been created without Phillips' knowledge or consent. As far as Daugherty knew, Phillips had merely been "sexting"[23] her male co-workers. Title VII does not require an employer to interfere with consensual relationships existing among its employees. *Knabe*, 114 F.3d at 412, n. 9 (describing the fact that a supervisor accused of harassing one subordinate had previously "engaged in a consensual affair" with a different subordinate as "irrelevant" to the Title VII inquiry). As this Court has previously recognized, "many employees would find an employer's interference with a consensual relationship to be highly objectionable." *Toth v. California University of Pennsylvania*, 844 F.Supp.2d 611, 635 (W.D.Pa. 2012). Even an individual who willingly poses nude outside of the workplace may find workplace discussion of that topic to be offensive. *Burns v. McGregor Electronic Industries, Inc.*, 989 F.2d 959, 961-964 (8th Cir. 1993). Since Daugherty had no reason to believe that Phillips had been victimized by the creation or distribution of the photographs, it was not

---

[23] The United States Court of Appeals for the Third Circuit has described "sexting" as "the practice of sending or posting sexually suggestive text messages and images, including nude or semi-nude photographs, via cellular telephones or over the Internet." *Miller v. Mitchell*, 598 F.3d 139, 143 (3d Cir. 2010).

unreasonable for him to quietly instruct Jason to delete them without drawing further attention to the matter. (Docket No. 38-2 at 4, ¶¶ 14-15).

Phillips testified that she had never seen the pictures of her naked body stored on Jason's telephone. (Docket No. 38-1 at 10). In light of her testimony, Phillips cannot claim to have "personal knowledge" of how she was portrayed in those pictures. FED. R. CIV. P. 56(c)(4). Daugherty and Jason both declared that Phillips had "appeared to be awake, alert and conscious" in the photographs viewed on February 14, 2011. (Docket No. 38-2 at 3, ¶ 13; Docket No. 38-4 at 3, ¶ 14). Had the images themselves been submitted into evidence, the Court could have evaluated the accuracy of the statements made by Daugherty and Jason. *Scott v. Harris*, 550 U.S. 372, 377-381, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)(holding that a court presented with a motion for summary judgment was free to reject testimonial evidence that was clearly contradicted by a videotape depicting the events in question). Since the photographs are not contained in the record, the declarations made by Daugherty and Jason remain uncontradicted. Even if it is assumed that Maurice (or someone else) illegally produced nude photographs of Phillips without her knowledge or consent, the record contains no evidence which suggests that the photographs themselves should have alerted Daugherty to that fact. Furthermore, Phillips testified that she had never told King (or any other postal employee) about how she had awoken in a state of nudity after spending an evening with Maurice. (Docket No. 38-1 at 10). In an investigative affidavit completed on October 6, 2011, King stated that the "naked pictures" stored on Jason's telephone had been taken when Phillips was "dating" Maurice. (Docket No. 38-6 at 4-5). Even the documents completed at that late date contain no indications that King knew (or should have known) that Phillips had (allegedly) been victimized by unlawful voyeurism. It is axiomatic that an instance of voluntary "sexting" would not warrant the same

type of response that would be needed to protect the interests of an employee whose nude body has been photographed without his or her permission. *Knabe*, 114 F.3d at 414 (explaining that the adequacy of an employer's chosen remedy presents "a highly fact-specific inquiry" that turns on "the severity and frequency of the harassment" suffered by the aggrieved employee). Because the gravity of the situation could not have been apparent to Daugherty and King prior to February 27, 2011, their failure to react more aggressively during the previous two weeks cannot be reasonably characterized as "negligence."[24] *Huston*, 568 F.3d at 104-110 (explaining the standards for determining whether an employer has been placed on constructive notice of a non-supervisory employee's harassing behavior).

In both her original and amended complaints, Phillips described the nude photographs on Jason's telephone as "private pictures" that had been forwarded to him by her "ex-boyfriend." (Docket No. 1 at ¶ 10; Docket No. 13 at ¶ 11). At an earlier stage in this case, Phillips attempted to assert a race-based discrimination claim premised on her association with Maurice, who was described in her complaint as an "African American male." (Docket No. 1 at ¶¶ 5, 10). She later stipulated to the dismissal of that claim. (Docket Nos. 10 & 11). During her deposition, Phillips denied that she had ever been involved in an intimate relationship with Maurice. (Docket No. 38-1 at 7). She expressed disagreement with some of the filings that had been drafted by her counsel. (*Id.* at 11). It appears that the nature of Phillips' relationship with Maurice and the circumstances surrounding the creation of the nude pictures were unknown to her counsel prior to the deposition. If Phillips' own attorney did not know that Phillips was claiming to be a

---

[24] The mere fact that a female employee may provide nude images of herself to one male co-worker does not necessarily mean that she expects those images to be viewed by other employees. Nonetheless, an employer's response to workplace "sexting" need not resemble its response to sex-based criminal activity in order to satisfy its obligations under Title VII. *Knabe v. Boury Corp.*, 114 F.3d 407, 414, n. 13 (3d Cir. 1997)(recognizing that a mere "warning" would not constitute an "adequate remedy" to an allegation of rape).

victim of voyeurism until December 19, 2012, it is difficult to fathom how Daugherty and King could have been expected to know about that allegation as early as February 14, 2011.[25]

On the basis of the present record, a reasonable jury could conclude that Phillips was subjected to "discrimination" because of her sex, that the discrimination was sufficiently severe to alter the "terms, conditions, or privileges" of her employment, and that an objectively reasonable employee in her situation would have found her work environment to be "hostile or abusive." *Oncale*, 523 U.S. at 80-82; *Harris*, 510 U.S. at 21-23. Since Jason was not Phillips' supervisor, the Postal Service cannot be held vicariously liable for his harassing conduct. *Vance*, 133 S.Ct. at 2443. The actions taken by Daugherty and King were "reasonably calculated to prevent further harassment." *Knabe*, 114 F.3d at 414. Phillips testified that no incidents pertaining to the nude photographs had occurred after Jason's suspension. (Docket No. 38-1 at 12). Because the remedial actions taken by Daugherty and King quickly eliminated the conditions that had rendered Phillips' work environment hostile, Phillips cannot establish that the Postal Service was negligent in dealing with her complaints. *Huston*, 568 F.3d at 110. The Postmaster General's motion for summary judgment will be granted with respect to Phillips' "hostile work environment" claim. (Docket No. 13 at ¶ 7).

### B. The Retaliation Claims

The anti-retaliation provision of Title VII applicable to private-sector employers is codified at 42 U.S.C. § 2000e-3(a). That provision declares it to be an "unlawful employment practice" for a covered employer "to discriminate against" an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation,

---

[25] The amended complaint, which referred to the nude images as "private pictures" and to Maurice as Phillips' "ex-boyfriend," was filed on September 13, 2012. (Docket No. 13 at ¶ 11).

proceeding, or hearing" thereunder.  42 U.S.C. § 2000e-3(a).  As discussed earlier, the United

States is not an "employer" within the meaning of Title VII.  42 U.S.C. § 2000e(b).  Before

considering Phillips' retaliation claims, the Court must determine whether such claims are

cognizable under Title VII's federal-sector provision.

The federal-sector provision explicitly requires the Postal Service to make its "personnel"

decisions "free from any discrimination based on race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-16(a).  No provision of Title VII specifically prohibits a federal employer

from retaliating against an employee who "opposes" discrimination or "participates" in EEO

proceedings.  *Ullrich*, 457 Fed.Appx. at 139, n. 5.  The absence of a federal-sector anti-

retaliation provision, however, does not end the inquiry.  Congress' enactment of a statutory

provision prohibiting a broad range of status-based discrimination "may signal a concomitant

intent to ban retaliation against individuals who oppose that discrimination, even where the

statute does not refer to retaliation in so many words."  *University of Texas Southwestern*

*Medical Center v. Nassar*, 570 U.S. ___, ___, 133 S.Ct. 2517, 2530, 186 L.Ed.2d 503 (2013).

The Supreme Court has repeatedly construed statutes prohibiting status-based discrimination to

proscribe retaliation against individuals who complain about such discrimination.  *CBOCS West,*

*Inc. v. Humphries*, 553 U.S. 442, 452-457, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008); *Jackson v.*

*Birmingham Board of Education*, 544 U.S. 167, 173-180, 125 S.Ct. 1497, 161 L.Ed.2d 361

(2005); *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 235-237, 90 S.Ct. 400, 24 L.Ed.2d

386 (1969).

The Age Discrimination in Employment Act of 1967 ("ADEA") [29 U.S.C. § 621 *et seq.*]

prohibits a covered private-sector employer from discriminating against an employee or

applicant for employment because of his or her age.[26]  29 U.S.C. § 623(a).  A separate provision

of the ADEA specifically prohibits private-sector employers from retaliating against employees

or applicants who complain about age-based discrimination.  29 U.S.C. § 623(d).  The ADEA's

federal-sector provision provides that "[a]ll personnel actions affecting employees or applicants

for employment who are at least 40 years of age . . . in the United States Postal Service . . . shall

be made free from any discrimination based on age."  29 U.S.C. § 633a(a).  In *Gomez-Perez v.

Potter*, 553 U.S. 474, 486-491, 128 S.Ct. 1931, 170 L.Ed.2d 887 (2008), the Supreme Court held

that the ADEA's federal-sector provision prohibited retaliation as well as age-based

discrimination even though it did not specifically mention retaliation.  Rejecting the argument

that the ADEA's separate treatment of age-based discrimination and retaliation in the provisions

applicable to private-sector employees counseled against reading a prohibition against retaliation

into the provision applicable to federal employers, the Supreme Court observed that the ADEA's

federal-sector provision had been modeled after Title VII's federal-sector provision rather than

after the ADEA's private-sector provisions.[27]  *Gomez-Perez*, 553 U.S. at 486-488.  It was noted

that Title VII's federal-sector provision contained "a broad prohibition of 'discrimination'"

rather than "a list of specific prohibited practices."  *Id.* at 487.  Statutes which broadly prohibit

sex-based discrimination are typically construed to proscribe retaliation against those who

complain about such discrimination.  *Jackson*, 544 U.S. at 173-174.  Given the reasoning

employed in *Gomez-Perez*, the Court is convinced that Phillips' retaliation claims are cognizable

under Title VII's federal-sector provision.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C.Cir.

2009).  Since neither party contends that retaliation claims arising under § 2000e-16(a) are

---

[26] The class of individuals entitled to statutory protection under the ADEA is limited to those who have reached the age of forty.  29 U.S.C. § 631(a).

[27] The similarities between Title VII's federal-sector provision and the ADEA's federal-sector provision had previously been acknowledged in *Lehman v. Nakshian*, 453 U.S. 156, 167, n. 15, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981).

governed by different standards than those arising under § 2000e-3(a), Phillips' retaliation claims against the Postal Service will be considered in accordance with the framework utilized to evaluate retaliation claims brought against private-sector employers. *Ullrich*, 457 Fed.Appx. at 139-140.

Retaliation claims are typically considered in accordance with the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973), and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006); *Straka v. Comcast Cable*, 897 F.Supp.2d 346, 366 (W.D.Pa. 2012). Under that framework, the plaintiff must establish a *prima facie* case of discrimination.[28] *McDonnell Douglas*, 411 U.S. at 802. If a *prima facie* case is established, the defendant must articulate a legitimate, nondiscriminatory reason for treating the plaintiff in an adverse manner. *Id.* at 802-803. If the defendant articulates a legitimate, nondiscriminatory reason for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reason given by the defendant for such treatment is merely a pretext for unlawful discrimination. *Id.* at 804-805. Evidence suggesting that an employer's explanation for an adverse action is unworthy of credence constitutes a form of circumstantial evidence that a plaintiff can use to establish that the action was taken for a discriminatory reason. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003).

A *prima facie* case "raises an inference of discrimination" sufficient to shift the burden of production to the defendant. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). This inference is based on a presumption that certain actions, if left unexplained, "are more likely than not based on the consideration of impermissible factors."

---

[28] Retaliation is itself a form of "discrimination" proscribed by Title VII. *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. ___, ___, 133 S.Ct. 2517, 2532, 186 L.Ed.2d 503 (2013); *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 62, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

*Id.* When a *prima facie* case is established, the burden of production shifts to the defendant to rebut the presumption of discrimination through the introduction of admissible evidence suggesting that the challenged action was taken for a legitimate, nondiscriminatory reason. *Burdine*, 450 U.S. at 254-255. To sustain this burden, the defendant need not demonstrate the genuineness of its proffered explanation. *Id.* at 254. The inquiry as to whether the defendant has met its burden of production "can involve no credibility assessment," since "the burden-of-production determination necessarily *precedes* the credibility-assessment stage." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)(emphasis in original). The defendant satisfies its burden, and rebuts the plaintiff's *prima facie* case, simply by introducing admissible evidence that, *if taken as true*, would *permit* a finding that the challenged action was taken for a legitimate, nondiscriminatory reason. *Mitchell*, 884 F.Supp.2d at 370.

If the defendant satisfies its burden of production, the factual dispute is framed with "sufficient clarity" to give the plaintiff "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255-256. In order to hold the defendant liable for discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the *real reason* for the action at issue. *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). Liability cannot be premised on a jury's mere *disbelief* of the defendant's explanation for taking that action. *St. Mary's Honor Center*, 509 U.S. at 519. Instead, the plaintiff must affirmatively convince the jury that "the action was taken on the basis of an impermissible discriminatory criterion." *Mitchell*, 884 F.Supp.2d at 370. Nonetheless, evidence discrediting the defendant's proffered reason for the adverse action, when coupled with the plaintiff's *prima facie* case, may sufficiently undermine the defendant's credibility to permit a finding that illegal discrimination

has occurred. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The plaintiff is not always required to introduce "additional, independent evidence of discrimination." *Id.* at 149. Circumstantial evidence is not only sufficient to support a finding of liability for discrimination, "but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace*, 539 U.S. at 100, quoting *Rogers v. Missouri Pacific Railroad Co.*, 352 U.S. 500, 508, n. 17, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). The propriety of summary judgment in a particular case depends on the strength or weakness of the plaintiff's *prima facie* case, the probative value of the evidence discrediting the defendant's explanation for the challenged action, and the presence or absence of additional evidence that may properly be considered in determining whether a judgment as a matter of law is warranted. *Toth*, 844 F.Supp.2d at 638.

In order to assert a retaliation claim under Title VII, Phillips must demonstrate that she engaged in conduct entitled to statutory protection. *Mitchell*, 884 F.Supp.2d at 378. Title VII protects a broad range of conduct constituting "opposition" to discrimination. *Crawford v. Metropolitan Government of Nashville & Davidson County*, 555 U.S. 271, 277, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009)(observing that an individual may "oppose" discrimination even though he or she "has taken no action at all to advance a position beyond disclosing it"). The filing of an EEO complaint with a federal agency similarly falls within the range of conduct protected under Title VII. *McKinnon v. Gonzales*, 642 F.Supp.2d 410, 425 (D.N.J. 2009). Since Phillips informally complained to King about Jason's conduct and subsequently filed formal EEO complaints alleging the existence of a "hostile work environment," she obviously engaged in statutorily-protected activities. (Docket No. 7-1).

An employee's conduct enjoys statutory protection from retaliation only if it is undertaken pursuant to an "objectively reasonable belief" that the actions "opposed" or alleged constitute a form of "discrimination" that is prohibited under Title VII. *Moore*, 461 F.3d at 341. Title VII does not protect an employee from retaliation for confronting or alleging conduct that no reasonable person would believe to be a violation of its prohibition against status-based discrimination. *Prise v. Alderwoods Group, Inc.*, 657 F.Supp.2d 564, 609 (W.D.Pa. 2009). As explained earlier, however, a reasonable person in Phillips' position may have perceived his or her work environment to be sufficiently abusive to violate Title VII. *Harris*, 510 U.S. at 21-23. It is reasonable to assume that Jason would not have possessed or displayed nude images of a male co-worker. *Oncale*, 523 U.S. at 80. Given the "extremely serious" nature of Jason's conduct, Phillips can establish that she acted on the basis of a reasonable belief that she was "opposing" or alleging a proscribed form of discrimination.[29] *Clark County School District v. Breeden*, 532 U.S. 268, 270-271, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)(*per curiam*).

An act of discrimination taken in retaliation for an employee's protected conduct violates Title VII only if it is "materially adverse" to the employee. *LeBoon v. Lancaster Jewish Community Center Association*, 503 F.3d 217, 231 (3d Cir. 2007). "An action is considered to be 'materially adverse' to an employee if it might have dissuaded an objectively reasonable employee from engaging in statutorily-protected conduct." *Howard*, 742 F.Supp.2d at 704, n. 11. This standard "screen[s] out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 70, 126 S.Ct. 2405, 165

---

[29] Phillips need not establish an underlying violation of Title VII in order to demonstrate that she engaged in protected activities. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). It is sufficient for her to establish that she "opposed" or complained about discriminatory conduct that she reasonably believed to be unlawful. *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993).

L.Ed.2d 345 (2006). Phillips alleges that she was discharged in retaliation for her EEO complaints. (Docket No. 13 at ¶¶ 27-32). A "retaliatory discharge" obviously qualifies as a "materially adverse" action. *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 711 (W.D.Pa. 2006).

On June 14, 2011, Phillips amended her EEO complaint to allege that King and Buzzell had improperly disclosed information about her case to Murphy and Stragand. (Docket No. 7-1 at 13). Buzzell encountered Phillips on June 25, 2011, and asked why his name had been mentioned in the EEO complaint. (Docket No. 38-11 at 9). Phillips apparently responded by stating that her attorney had advised her not to discuss the matter. (*Id.*). The conversation left Phillips so upset that she decided to leave her work station for the remainder of the day. (Docket No. 38-1 at 15). Phillips testified that, after her return, Buzzell and Dee had made unexpected changes to her work schedule and instructed her to perform difficult tasks involving mail destined for Cleveland, Ohio. (*Id.* at 17-19). In a subsequent amendment to her EEO complaint, Phillips described the conduct of Buzzell and Dee as evidence of "additional retaliation." (Docket No. 7-1 at 16). She appears to partially base her retaliation claims on that conduct. (Docket No. 13 at ¶¶ 25-26).

Delaney and Wells have submitted declarations stating that, as a PSE, Phillips was "not entitled to pick a particular job assignment or layoff day." (Docket No. 38-17 at 3, ¶ 7; Docket No. 38-18 at 3, ¶ 7). The Postmaster General contends that since the scheduling changes and work assignments alleged by Phillips were consistent with her job description, she cannot establish that they constituted "materially adverse" acts of retaliation. (Docket No. 36 at 14-16). The argument advanced by the Postmaster General contradicts the very decision in which the standard of "material adversity" was adopted. In *Burlington Northern & Sante Fe Railway Co.*

*v. White*, 548 U.S. 53, 70, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006), the Supreme Court flatly rejected the notion that "a reassignment of duties" could not constitute "retaliatory discrimination" merely because the plaintiff's "former and present duties" both fell within her job description. Since "[a]lmost every job category involves some responsibilities and duties that are less desirable than others," "[c]ommon sense suggests that one good way to discourage an employee such as [Phillips] from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable." *Burlington Northern*, 548 U.S. at 70-71. On the basis of the existing record, "a jury could reasonably conclude that the reassignment of responsibilities [described by Phillips] would have been materially adverse to a reasonable employee." *Id.* at 71.

A plaintiff bringing a retaliation claim under Title VII must establish that his or her protected activity was a "but-for cause" of the "materially adverse" action taken by his or her employer. *Nassar*, 133 S.Ct. at 2534. In order to complete her *prima facie* case, Phillips must present evidence suggesting that there was a causal connection between her protected activity and the adverse actions taken against her by the Postal Service. *Wilkerson v. New Media Technology Charter School, Inc.*, 522 F.3d 315, 320 (3d Cir. 2008). A "broad array of evidence" may be used to satisfy this burden. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 283-284 (3d Cir. 2000). The evidence presented by Phillips must be adequate to *create an inference* that the adverse actions underpinning her claims were taken on the basis of a retaliatory animus. *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

Since Phillips engaged in activities protected under Title VII, she fell within a class of persons enjoying statutory protection from "discrimination." *Nassar*, 133 S.Ct. at 2532. A

plaintiff attempting to establish a violation of Title VII must ordinarily demonstrate that his or her employer was aware of his or her membership in a protected class.  *Geraci v. Moody-Tottrup, International, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996).  In the retaliation context, the plaintiff must demonstrate that his or her protected conduct was known to his or her employer at the time of the alleged retaliatory action.  *Hargrave v. County of Atlantic*, 262 F.Supp.2d 393, 423, n. 13 (D.N.J. 2003).  It is axiomatic that an employer must be aware of an employee's protected activity in order to act on the basis of a retaliatory motive stemming from that activity.  *Bedford v. Southeastern Pennsylvania Transportation Authority*, 867 F.Supp. 288, 293 (E.D.Pa. 1994).

Buzzell's knowledge of Phillips' protected conduct is clearly established in the record. On July 25, 2011, Buzzell specifically asked Phillips why his name had appeared in her EEO complaint.  (Docket No. 38-1 at 16; Docket No. 38-11 at 9).  Delaney and Wells have both submitted declarations stating that they had no knowledge of Phillips' prior EEO activities at the time of her discharge.  (Docket No. 38-17 at 7, ¶¶ 46-47; Docket No. 38-18 at 7, ¶¶ 51-52). Wells' memorandum documenting Phillips' discharge was co-signed by Buzzell, who was listed as the "concurring official."  (Docket No. 38-22 at 2).  In her declaration, Wells asserted that Buzzell's role as the "concurring official" had been to confirm that the "proper administrative procedures" had been followed, and that the stated basis for Phillips' termination was a "recognized basis for termination."  (Docket No. 38-18 at 7, ¶ 49).  Wells further declared that Buzzell had "played no other role" in the decision to discharge Phillips.  (*Id.* at 7, ¶ 50).  Thus, the Postmaster General moves for summary judgment on the ground that those responsible for terminating Phillips had no knowledge of her earlier EEO activities.  (Docket No. 36 at 17-18).

The Postmaster General's attempt to dissociate Buzzell from the termination decision is problematic for two reasons. First of all, it is difficult to fathom how Buzzell could have fulfilled his duties as the "concurring official" without giving some consideration to the reasons for Phillips' discharge. Phillips was ostensibly terminated because of two[30] unscheduled absences, one of which was inextricably intertwined with her EEO complaint. (Docket No. 38-17 at 4, ¶ 16; Docket No. 38-18 at 4, ¶ 16). A reasonable jury could arguably infer that Buzzell and Wells discussed the reasons for Phillips' first absence, which had itself been triggered by a verbal encounter about her previous EEO filings. *Alred v. Eli Lilly & Co.*, 771 F.Supp.2d 356, 365 (D.Del. 2011). Moreover, a finding of unlawful retaliation could be made on the basis of the present record even if it is assumed that Wells and Delaney had no knowledge of Phillips' protected conduct. On August 16, 2011, Delaney indicated that Phillips' attendance was "unacceptable." (Docket No. 38-17 at 4, ¶¶ 17-18). That rating played a direct role in Wells' termination decision. (Docket No. 38-18 at 4-5, ¶¶ 16-23). During her deposition, Phillips testified that Delaney had directly attributed the rating to information provided by Buzzell, Dee and Wells.[31] (Docket No. 38-1 at 21). If Buzzell convinced Delaney to give Phillips an "unacceptable" attendance rating with the specific intent of effectuating her discharge, any retaliatory motive harbored by him may have proximately caused the termination of Phillips' employment. *Staub v. Proctor Hospital*, 562 U.S. ___, ___, 131 S.Ct. 1186, 1192-1194, 179 L.Ed.2d 144 (2011); *McKenna v. City of Philadelphia*, 649 F.3d 171, 178-179 (3d Cir. 2011); *Mitchell*, 884 F.Supp.2d at 372. Phillips testified that Buzzell had started to give her unfavorable work assignments shortly after their verbal exchange. (Docket No. 38-1 at 18). Under the

---

[30] The documentary record suggests that Phillips may have been absent on August 8, 2011. (Docket No. 38-15 at 2). During her deposition, however, Phillips denied that she had missed work on that date. (Docket No. 38-1 at 21). In their declarations, Delaney and Wells only made reference to Phillips' absences on July 25, 2011, and August 26, 2011. (Docket No. 38-17 at 4-6, ¶¶ 16-40; Docket No. 38-18 at 4-6, ¶¶ 16-40).
[31] Delaney apparently played no role in supervising Phillip's day-to-day activities. (Docket No. 38-1 at 21).

present circumstances, a reasonable trier of fact could infer that a causal relationship existed between Phillips' protected activities and the subsequent actions taken against her. *Kachmar v. Sungard Data Systems, Inc.*, 109 F.3d 173, 178 (3d Cir. 1997)(explaining that the "element of causation" must be considered on a "context-specific" basis).

Since Phillips has established a *prima facie* case of retaliation, the Postmaster General must articulate legitimate, nondiscriminatory reasons for giving Phillips unfavorable work assignments and ultimately terminating her employment. *Scheidemantle v. Slippery Rock University*, 470 F.3d 535, 539 (3d Cir. 2006). To satisfy his burden, the Postmaster General "must clearly set forth, through the introduction of admissible evidence, the [Postal Service's] reasons" for treating Phillips in an adverse manner. *Burdine*, 450 U.S. at 255. In an EEO investigative affidavit signed subsequent to Phillips' discharge, Buzzell stated that any changes made to Phillips' schedule and work assignments during the summer of 2011 had been dictated by the needs of the Postal Service. (Docket No. 38-11 at 17). In their declarations, Delaney and Wells stated that Phillips had been discharged for taking unscheduled absences and failing to use the proper call-off number to provide notice of those absences. (Docket No. 38-17 at 4-7, ¶¶ 16-45; Docket No. 38-18 at 4-7, ¶¶ 16-46). Phillips was evidently provided with a list of work-related telephone numbers during her orientation as a PSE. (*Id.* at 5, ¶ 27). The number designated for employees attempting to report an absence was separate from the number listed for individuals trying to reach the tour office. (Docket No. 38-21 at 3). Phillips testified that she had called the tour office on the morning of August 26, 2011, to report that she would be missing work because of a migraine headache. (Docket No. 38-1 at 23).

The Family and Medical Leave Act of 1993 ("FMLA") [29 U.S.C. § 2601 *et seq.*] provides an eligible employee with a statutory right to twelve weeks of unpaid leave necessitated

by a "serious health condition" that renders him or her "unable to perform the functions" of his or her job. 29 U.S.C. § 2612(a)(1)(D). An employer covered by the FMLA may require that a request for medical leave "be supported by a certification issued by the health care provider of the eligible employee." 29 U.S.C. § 2613(a). The Postal Service falls within the FMLA's definition of the term "employer." 29 U.S.C. §§ 203(x), 2611(4)(A)(iii). Delaney and Wells declared that the decision to terminate Phillips' employment had been partially based on her failure to provide the appropriate documentation for her absences. (Docket No. 38-17 at 6, ¶¶ 34-40; Docket No. 38-18 at 6-7, ¶¶ 38-45).

Since the Postmaster General has presented admissible evidence supporting his assertion that the actions taken against Phillips were motivated by factors other than her protected activities, he has rebutted the presumption of discrimination raised by her *prima facie* case. *Burdine*, 450 U.S. at 255. In order to defeat the Postmaster General's motion for summary judgment, Phillips must point to evidence that could enable a reasonable jury to conclude that the "materially adverse" actions taken against her were motivated by a "discriminatory animus." *Fuentes*, 32 F.3d at 765. "Proof that an employer's explanation for an adverse employment action is unworthy of credence can be a powerful form of circumstantial evidence that is probative of intentional discrimination." *Venter v. Potter*, 694 F.Supp.2d 412, 424 (W.D.Pa. 2010). Consequently, it is not always necessary for a plaintiff in Phillips' position to "introduce additional, independent evidence of discrimination." *Reeves*, 530 U.S. at 149. Evidence relied upon to establish Phillips' *prima facie* case may also be used to demonstrate that the reasons given by the Postal Service for her unfavorable work assignments and subsequent discharge are merely a pretext for unlawful discrimination. *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008).

Phillips amended her EEO complaint on June 14, 2011, to allege that King and Buzzell had discussed her original allegations with Murphy and Stragand.[32] (Docket No. 7-1 at 13-14). On July 25, 2011, Buzzell encountered Phillips and asked why his name had been mentioned in her EEO complaint. (Docket No. 38-11 at 9). Phillips testified that Buzzell had "screamed" at her for alleging that he had improperly disclosed information about her case to Murphy and Stragand. (Docket No. 38-1 at 16). After completing a leave slip, Phillips left work for the day. (*Id.*). She testified that she had never been asked to submit leave slips documenting her earlier absences. (*Id.*). Phillips also asserted that, after her return to work, Buzzell had started to change her schedule without notice and give her unfavorable work assignments. (*Id.* at 17-19). When the "temporal proximity" between an employee's protected activity and the employer's "materially adverse" action is "unusually suggestive" of causation, a genuine issue of material fact may exist as to whether unlawful retaliation has occurred. *Lichtenstein v. University of Pittsburgh Medical Center*, 691 F.3d 294, 307 (3d Cir. 2012).

Delaney performed a "thirty-day employee evaluation" of Phillips on August 16, 2011. (Docket No. 38-17 at 4, ¶ 17). Phillips received an "unacceptable" rating in the area of attendance. (Docket No. 38-19 at 2). Her performance was deemed to be "satisfactory" in all other respects. (*Id.* at 2-3). The low rating in the attendance category appears to have been based *solely* on the fact that had Phillips left work early on July 25, 2011. (Docket No. 38-17 at 4, ¶¶ 16-18). Phillips' early departure on that date was precipitated by her verbal exchange with

---

[32] In EEO administrative affidavits signed in August 2011, Murphy and Stragand both denied that they had discussed Phillips' case with King or Buzzell. (Docket No. 38-9 at 2; Docket No. 38-10 at 2). The protected nature of Phillips' EEO complaint, however, does not turn on the truth or falsity of the allegations contained therein. Phillips need only demonstrate that she acted pursuant to an "objectively reasonable belief" that those allegations were true, and that the disclosures allegedly made by King and Buzzell were proscribed by Title VII. *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006). Given the sensitive nature of Phillips' dispute with Jason and Maurice, a reasonable person in Phillips' position may have found the improper disclosures alleged in her EEO complaint to be factors contributing to the existence of a "hostile work environment." *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 115-118, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

Buzzell about the amendment to her EEO complaint. (Docket No. 38-1 at 15-16). She testified that Delaney had directly attributed the findings of the evaluation to information provided by Buzzell, Dee and Wells. (Docket No. 38-1 at 21).

Phillips missed work on August 26, 2011, because of a migraine headache. (Docket No. 38-1 at 23). She called the tour office in order to inform the Postal Service of her impending absence.[33] (*Id.* at 23). When Phillips reported for work the next day, Dee had her sign a leave slip. (*Id.* at 24). He instructed her to take the completed leave slip to Wells' office. (*Id.*). Delaney and Wells met with Phillips later that day. (Docket No. 38-17 at 5, ¶ 30). Wells told Phillips that she had used the wrong telephone number to report her absence. (Docket No. 38-18 at 5, ¶ 31). Phillips responded by saying that she had never been instructed to use the "call-off" number, and that she had contacted the tour office to report her absences on previous occasions. (*Id.* at 5, ¶ 32). Wells asked Phillips whether she could provide documentation for her unscheduled absences on July 25, 2011, and August 26, 2011. (*Id.* at 5-6, ¶ 34). No such documentation was available. (*Id.*).

At some point, Phillips contacted the office of a physician and scheduled an appointment for September 8, 2011. (Docket No. 38-1 at 24). The appointment was apparently scheduled so that Phillips could satisfy the FMLA's "certification" requirement. 29 U.S.C. § 2613(a). Phillips testified that she had informed Wells of the impending appointment during the meeting conducted on August 27, 2011. (Docket No. 38-1 at 25). In their declarations, Delaney and Wells denied that Phillips had made such a representation at the meeting. (Docket No. 38-17 at 6, ¶¶ 42-43; Docket No. 38-18 at 6, ¶¶ 41-42).

A second meeting between Phillips, Delaney and Wells was convened on September 2, 2011. The parties advance differing accounts of what transpired at the meeting. Delaney and

---

[33] The testimonial evidence indicates that King's work station was located in the tour office. (Docket No. 38-1 at 5).

Wells declared that Phillips had been asked to provide documentation for both absences. (Docket No. 38-17 at 6, ¶ 38; Docket No. 38-18 at 6, ¶ 38). According to Phillips, Wells asked about the July 25, 2011, absence without requesting additional documents. (Docket No. 38-1 at 25-26). In any event, it is undisputed that Phillips responded to the inquiry by referring Delaney and Wells to her attorney. (*Id.* at 26; Docket No. 38-17 at 6, ¶ 39; Docket No. 38-18 at 6, ¶ 39). The parties agree that Phillips was asked to provide documentation for the August 26, 2011, absence. (Docket No. 38-1 at 25; Docket No. 38-17 at 6, ¶ 38; Docket No. 38-18 at 6, ¶ 38). Phillips testified that she had responded to that request by stating that she had a medical appointment scheduled for September 8, 2011, and that documentation for the absence would be procured at that time. (Docket No. 38-1 at 25). Delaney and Wells declared that Phillips had never mentioned the medical appointment during the meeting. (Docket No. 38-17 at 6, ¶¶ 41-42; Docket No. 38-18 at 6, ¶¶ 41-42). Wells concluded the meeting by informing Phillips of her discharge. (Docket No. 38-18 at 6-7, ¶ 45).

In a memorandum dated September 3, 2011, Wells stated that Phillips had been terminated for failing to follow the appropriate call-off procedures and declining to provide the requested documentation for her absences. (Docket No. 38-22 at 2). The memorandum was co-signed by Buzzell, who was designated as the "concurring official." (*Id.*). The asserted reasons for Phillips' discharge were repeated in Harkins' letter of September 9, 2011. (Docket No. 39-1 at 4). The letter made reference to Phillips' "continued unscheduled absences," her failure to follow the appropriate "call-off procedures," and her inability to "provide documentation" for her absences. (*Id.*).

Since the evidence must be viewed in the light most favorable to Phillips, the portion of her testimony concerning the disclosure of the September 8, 2011, medical appointment must be

credited at this stage. *Daniel v. Pittsburgh & Lake Erie Railroad Co.*, 389 F.2d 922, 924 (3d Cir. 1968). Even in the absence of that testimony, however, a reasonable trier of fact may have reason to doubt the genuineness of the reasons for Phillips' discharge put forth by the Postal Service. (Docket No. 36 at 18-22). Phillips' attendance was described as "unacceptable" even though she had only missed *five hours* of work during her first month as a PSE.[34] (Docket No. 38-1 at 72; Docket No. 38-19 at 2). The leave slips submitted by Phillips suggest that her absences were "approved" for reasons other than her statutory entitlement to leave under the FMLA. (Docket No. 38-1 at 72-73). The postal employees responsible for taking "official action" on the leave requests did not indicate that they had been approved "pending documentation."[35] (*Id.*). Phillips has presented a copy of a policy stating that postal employees are "required to submit medical documentation or other acceptable evidence of [their] incapacity for work" only for absences exceeding three days. (Docket No. 39-1 at 11). Neither of Phillips' absences lasted long enough to implicate that policy. Furthermore, the exact nature of the "documentation" demanded by Wells is not entirely clear. Episodic illnesses do not invariably require the assistance of medical professionals. That is why some medications may be obtained without a prescription. 21 U.S.C. § 811(g)(1). Employees working in any occupation occasionally miss work for illnesses that do not require medical attention. It is worth noting that the Referee awarded Phillips unemployment compensation benefits after concluding that she had not been discharged for "willful misconduct."[36] (Docket No. 39-1 at 7-10). In light of the

[34] In their declarations, Delaney and Wells stated that Phillips had been "told about the importance of being regular in attendance." (Docket No. 38-17 at 4, ¶ 14; Docket No. 38-18 at 4, ¶ 14). Most employees, however, would not equate *regular* attendance with *perfect* attendance.

[35] The forms contained checkbox options reading "Approved, not FMLA," "Approved FMLA, Pending Documentation Noted on Reverse" and "Approved, FMLA." (Docket No. 38-1 at 72-74). On both forms, the relevant managerial employee checked the box reading, "Approved, not FMLA." (*Id.*).

[36] Even if Phillips did engage in some form of "misconduct," the Postal Service was not free to discharge her for a discriminatory reason. *McDonald v. Sante Fe Trail Transportation Co.*, 427 U.S. 273, 283-284, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

questionable nature of the reasons given for Phillips' discharge, a reasonable jury could conceivably conclude that a retaliatory animus was "the most likely alternative explanation" for the Postal Service's decision. *Reeves*, 530 U.S. at 147. Accordingly, the Postmaster General's motion for summary judgment will be denied with respect to Phillips' retaliation claims. (Docket No. 35).

The Court acknowledges that some factors may point in favor of the Postmaster General's position. Phillips did not become a PSE until July 16, 2011. (Docket No. 38-18 at 3, ¶ 11). Her appointment to that position was apparently contingent upon her successful completion of a ninety-day probationary period. (*Id.* at 4, ¶ 12). It is certainly possible that the adjustments made to Phillips' work schedule and the Postal Service's increased scrutiny of her attendance record were attributable to the change in her position rather than to her complaints about discrimination. Those questions, however, will be more appropriately resolved by the trier of fact. Phillips need not discredit every conceivable explanation for her adverse treatment in order to defeat the Postmaster General's motion for summary judgment. *Tomasso v. Boeing Co.*, 445 F.3d 702, 707 (3d Cir. 2006)(explaining that "the rejection of some explanations may so undermine the employer's credibility as to enable a rational factfinder to disbelieve the remaining rationales, even where the employee fails to produce evidence particular to those rationales").

A Title VII plaintiff proceeding against a federal-sector employer responsible for "intentional discrimination" is entitled to pursue an award of compensatory damages. 42 U.S.C. § 1981a(a)(1). A complaining party seeking compensatory damages under Title VII is free to "demand a trial by jury." 42 U.S.C. § 1981a(c)(1). Phillips' amended complaint contains both a request for compensatory damages and a demand for a jury trial. (Docket No. 13 at 8-9). The

Supreme Court has recognized a direct connection between the availability of compensatory damages and a plaintiff's entitlement to a jury trial. *Landgraf v. USI Film Products*, 511 U.S. 244, 281, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)(remarking that "the jury trial option must stand or fall with the attached damages provisions"). Since Phillips is seeking compensatory damages in this case, the factual issues surrounding her retaliation claims must be resolved by a jury.[37] *Steinhardt v. Potter*, 326 F.Supp.2d 449, 453 (S.D.N.Y. 2004); *Craig v. O'Leary*, 870 F.Supp. 1007, 1010-1011 (D.Colo. 1994).

## VI.    Conclusion

The Postal Service is not vicariously liable for the discrimination allegedly perpetrated by Jason and Maurice. *Vance*, 133 S.Ct. at 2441-2443. Since the actions taken by the Postal Service stopped the harassment allegedly engaged in by those individuals, the Postmaster General is entitled to summary judgment with respect to Phillips' "hostile work environment" claim. *Knabe*, 114 F.3d at 411, n. 8. On the basis of the existing record, however, a reasonable jury could conclude that the "materially adverse" actions taken against Phillips would not have been taken in the absence of her complaints about discrimination. *Nassar*, 133 S.Ct. at 2533-2534. Specifically, Phillips has presented sufficient evidence to support a finding that she was initially given unfavorable work assignments and later discharged in retaliation for her EEO complaints. *Burlington Northern*, 548 U.S. at 70-71; *Johnson*, 451 F.Supp.2d at 711. Therefore, a genuine issue of material fact exists as to whether the Postal Service engaged in conduct proscribed by § 2000e-16(a). FED. R. CIV. P. 56(a). The Postmaster General's motion for

---

[37] Phillips' amended complaint also includes a request for punitive damages. (Docket No. 13 at 8). Punitive damages are not available under Title VII whenever the defendant is a "government," a "government agency," or a "political subdivision." 42 U.S.C. § 1981a(b)(1). The Postmaster General does not argue that the Postal Service qualifies as a "government agency" enjoying immunity from punitive damages. (Docket No. 36). At the present time, the Court expresses no opinion as to whether Phillips can seek an award of punitive damages in this case. *Cleveland v. Runyon*, 972 F.Supp. 1326, 1330 (D.Nev. 1997)(finding the Postal Service to be "immune from liability for punitive damages" in actions arising under Title VII).

summary judgment will be denied with respect to Phillips' retaliation claims.  An appropriate

order follows.


                                                    s/Nora Barry Fischer
                                                    Nora Barry Fischer
                                                    United States District Judge


Dated:  November 7, 2013
cc/ecf:  All counsel of record